UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DENNIS DELANO,

                Plaintiff,

    v.                                **DECISION AND ORDER**
                                           10-CV-922S

CITY OF BUFFALO, *et al.*,

                Defendants.

## I. INTRODUCTION

Thirteen-year-old Crystallynn Girard was found dead in her South Buffalo home on Valentine's Day, 1993. Her mother, Lynn DeJac Peters, was accused of strangling the young girl. Peters was eventually tried and convicted of second-degree murder in Erie County court; she was sentenced to 25 years to life imprisonment.

Among those testifying for the prosecution before the grand jury was Dennis Donahue, a one-time boyfriend of Peters who had quarreled with her on the night in question. Though once a potential suspect, Donahue passed a polygraph examination, and, by virtue of his grand jury testimony, received immunity from prosecution.

DNA tests performed years after the jury returned its verdict – tests not available at the time of the trial – indicated that male DNA was present in skin cells found in a smear of blood on a bedroom wall, on her bedding, and on Girard herself. Donahue, who was later convicted of strangling another woman, could not be excluded as a contributor to the DNA. Based in large part on this evidence, after 13 years in prison, Peters was released.

On February 13, 2008, approximately two months after Peters' conviction was vacated, then-Erie County District Attorney Frank Clark announced that a renewed

investigation, which included a new medical examination of Girard's body performed by two new forensic pathologists, revealed that Girard's death was the result not of strangulation as the original medical examiner had found, but of "acute cocaine intoxication" – an accidental drug overdose. In a public statement, Frank Clark concluded that Girard's death was "non-homicidal" and that "no one can be prosecuted for her death."

The plaintiff in this case, Dennis Delano, an erstwhile Buffalo Police detective and member of the department's cold-case squad who began investigating the Girard case in 2007, remained doubtful about the cause of Girard's death. He believed Donahue murdered Girard. And he therefore continued to investigate the case on his own time and his own dime. In the course of that investigation, he spoke to the media and released footage related to the case. Those actions, the Buffalo Police Department contended, violated various departmental regulations and were in contravention of direct orders from his superiors. The Police Department therefore brought disciplinary charges against Delano.

A hearing was held in connection with those charges, and an impartial hearing officer, or IHO, eventually rendered a 28-page decision in which he determined that Delano committed misconduct; the IHO recommended a 60-day unpaid suspension. The Buffalo Police Commissioner at the time, H. McCarthy Gibson, accepted the IHO's findings and recommendation. Less than one month later, Delano voluntarily retired from the police force.

Delano subsequently brought this suit under 42 U.S.C. § 1983 alleging that his suspension violated, as relevant here, the First Amendment of the United States

Constitution. He also brings a breach-of-contract claim, alleging that his suspension violated a collective-bargaining agreement.

Each of the defendants – Mayor Byron Brown, the Buffalo Police Department, the City of Buffalo, Daniel Derenda, Dennis Richards, and H. McCarthy Gipson – has moved for summary judgment. As discussed further below, principally because this Court finds that Detective Delano's actions were sufficiently disruptive to justify the suspension, and because there was no breach of contract, Defendants' motions are granted.[1]

## II. BACKGROUND

### A.    Facts[2]

Dennis Delano began a storied career at the Buffalo Police Department in 1985 as a precinct officer. In 2006, having risen to the position of detective in the homicide unit, he was asked to help form a cold-case unit. He soon began working on this newly formed unit, and was free to investigate any of the old, unsolved homicides he chose. He picked up Crystallynn Girard's file in early 2007.

Shortly after, on March 6, 2007, then-Commissioner Gibson issued a directive prohibiting all employees from speaking to the media unless authorized by Gibson himself, the deputy commissioner, or Michael DeGeorge, who occupied the newly

---

[1]  The City of Buffalo and the City of Buffalo Police Department moved for summary judgment on the ground, among others, that for various reasons they are not subject to suit. Plaintiff did not respond to these arguments and this Court therefore deems claims against those entities abandoned. Plaintiff also offered no response to Defendants' argument that Counts Two and Three of the complaint, pertaining to a claim under the New York State Constitution and a request for injunctive relief, should be dismissed. Those claims are also deemed abandoned. In the pages that follow, this Court will address Plaintiff's remaining claims (First Amendment and breach of contract) against the remaining defendants (Bryon Brown, Daniel Derenda, Dennis Richards, and H. McCarthy Gipson).

[2]  This Court has accepted facts in each party's statement of undisputed facts to the extent that they have not been controverted by the opposing party. See Local Rule 56(a)(2) (statements not specifically controverted are deemed admitted).

created position of special assistant to the commissioner for communications. The next month, Chief of Detectives Dennis Richards emailed Delano, informing him that officers must refer all media requests to DeGeorge.

Several months later, in November 2007, Peters was released from prison as a result of newly discovered DNA evidence. The homicide unit was assigned to work on the case anew, and the Buffalo Police Department made it clear that others were not to have any involvement.   In fact, one day after Delano returned a phone call from a witness in the case, Richards sent an email in which he "hereby ordered that any and all inquiries for information involving witnesses or suspects [] regarding the Crystallynn Girard homicide case . . .  be directed to Sgt. Daniel Rinaldo of the Homicide Squad." (Ex. B of Richard Decl.; Docket No. 44-2.) If there remained any confusion, then-Deputy Commissioner Daniel Derendna sent an email the very next day, writing, "The DeJac case has been turned over to Sgt[.] Rinaldo[']s crew. No one else for any reason is authorized to work on this case. Consider this a direct order." (Id.) There is no dispute that Delano was aware of these orders and that he was not a member of Sgt. Rinaldo's team.

On February 13, 2008, only a few days after these emails were sent, Erie County District Attorney Frank Clark issued a statement that Girard was in fact not murdered, but died of a drug overdose. Clark based this conclusion on a "re-examination" of "all items of evidence" and principally the examinations of forensic pathologists Dr. James Woytash and Dr. Michael M. Baden. (Clark Stmnt.; Docket No. 46-12.) Both pathologists arrived at the same conclusion: Girard died of "acute cocaine intoxication." Thus, Clark concluded, "No one can be prosecuted for [Girard's] death." (Id.)

But Detective Delano was unpersuaded. Pointing to the DNA evidence and the evidence of a struggle, he was convinced that Donahue committed the crime. In fact, he believed that the new cause of death was simply a convenient way for the District Attorney's office to dodge scrutiny over its decision to immunize Donahue by having him testify before the grand jury.

In pursuit of this theory, and for his "own personal knowledge," Delano travelled to Washington, D.C. – on personal time with his own money – for a forensic-science convention to "learn more about accidental overdoses and to apply any information to the Girard case and others." (Delano Aff., ¶ 62.) There he met a reporter, Scott Brown, from WGRZ in Buffalo, New York.  He spoke to Brown on camera in an interview that aired soon after. During the course of the interview, Delano informed Brown that he was speaking for himself – not on behalf of the department. That disclaimer was not aired, but the following three comments were:

- "To me, it just doesn't seem like there's enough evidence of an overdose to change a death certificate."

- "We have more questions now than we did originally."

- "Absolutely, absolutely [I would like to see the case reopened]. I'm not convinced justice was done in this case."

(Ex. P of Risman Decl.; Docket No. 44-6.) Delano also provided Scott Brown with photographs taken soon after Girard's death depicting Girard's bedroom, and a video-recording of Donahue's polygraph examination.

That interview and those disclosures led to disciplinary charges. The Police Department alleged that Delano violated direct orders and various rules and regulations

by continuing to investigate the case, speaking to the media about the case, and releasing departmental investigative materials. According to the Buffalo Police, it was also concerned that Delano's conduct would affect the prosecution of two other homicide investigations in which Donahue was a suspect.

A formal hearing on Delano's disciplinary charges was held over the course of several days in early 2009. Delano was represented by counsel. Ultimately, the IHO made several findings in a written decision issued on May 3, 2009. Those are summarized below:

- "The Commissioner's written directive on March 6, 2007 was a general order and/or an 'authoritative instruction' issued by the Department and that [] fell within the category of a 'lawful order' set forth in Section 1.3 [of the governing manual.] Clearly, [Delano] failed to comply with the 'authoritative instruction' and, in turn, failed to comply with a lawful order."

- Delano's "activities in Washington, D.C., where he turned over case materials . . . fairly and reasonably can be construed as conduct on his part that he 'continued to investigate the case.'"

- "By investigating the case, [Delano] clearly violated the direct order that prohibited him from continuing to work on the case since he was not a member of Sergeant Rinaldo's crew."

- "The record herein does not permit the conclusion that [Delano] was mislead [sic] by any ambiguity or 'past practice'; instead, the record shows that [Delano] intentionally and wilfully refused to follow the Commissioner's directive."

- Delano "conducted an independent investigation of the DeJac case (Crystallyn Girard homicide) outside his regularly assigned duties without the authority of a higher commanding officer and, in fact, in direct violation of all directives requiring him to act in a contrary manner."

- "The video of the Girard and DeJac crime scene and the video of a suspect taking a polygraph examination comfortably falls within the category of 'departmental photographs,' and the conclusion is inescapable that [Delano] released this material to the media without the permission of the Police Commissioner, the Deputy Police Commissioner, or the Public Information Officer."

- Delano's "misconduct was substantial, particularly as it reflected his willful disobedience of directives issued to him by those higher in the chain of command, including the Commissioner of Police. By definition, such conduct is 'prejudicial to the good order' and 'discipline' of the Department."

- Delano "had no reason or justification to overstep his boundaries and flagrantly disregard directives from his superiors."

(City Defs.' Stmnt. of Facts, ¶¶ 44–61; Docket No. 44-8.)

Delano did not appeal these findings, and, on May 8, 2009, he was suspended for 60 days without pay.

On June 3, 2009, Delano voluntarily retired from the police force.

## B.    Procedural history

Dennis Delano commenced this case on November 15, 2010. The parties engaged in an initial mediation session but could not arrive at a resolution. On August

22, 2013, Magistrate Judge H. Kenneth Schroeder Jr. denied a request to extend the case management order. (Docket No. 25.) No dispositive motion practice occurred. The parties – with each of the defendants represented by the City of Buffalo Department of Law – then appeared before this Court and represented that they were ready for trial, which was set for December 3, 2013. (Docket No. 27.)

But the City of Buffalo Department of Law then hired outside attorneys, who, in turn, requested time to file summary-judgment motions. In the interest of efficiency, this Court granted Defendants one month to file the motions and adjourned the trial date generally. (Docket Nos. 38, 43.) Mayor Brown, the Buffalo Police Department, the City of Buffalo, Daniel Derenda, and Dennis Richards filed a motion for summary judgment on April 21, 2014. On the same day, H. McCarthy Gibson, represented by separate counsel, moved separately for summary judgment. Gibson filed his own briefs but also joined the arguments of the other defendants. Briefing on these motions concluded on June 6, 2014, at which time this Court took them under consideration.

## III.  DISCUSSION

### A.    Summary-judgment standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute

regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## B.    Personal involvement

Personal involvement in the deprivation of federal constitutional rights is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y.1999). The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Under this standard, Defendants Daniel Derenda, Dennis Richards, and Mayor Byron Brown must be dismissed in connection with Delano's First Amendment claim.

Mayor Brown asserts that he had no involvement with the subject of this suit. Delano does not argue otherwise, but simply notes that Mayor Brown has a "supervisory role over the city." (Pl.'s Br. at 22; Docket No. 46-20.) This is manifestly insufficient to establish personal involvement.

As for Derenda and Richards, they ordered Delano not to work on the case or talk to the media about the case. But they were not involved in the alleged retaliation, which, if proven, would constitute the deprivation of Delano's federal constitutional rights. Therefore, these defendants will also be dismissed.

That leaves only former Commissioner H. McCarthy Gipson, who ordered Delano's suspension. This Court will proceed to address the merits of the case against him.

## C.    The First Amendment

### 1.    Speaking as a citizen, on a matter of public concern

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Lane v. Franks, 134 S. Ct. 2369, 2377 (2014) (quoting Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Delano contends that Gibson violated those rights by suspending him for 60 days in retaliation for speaking to the media about the Girard case.

On the most fundamental level, a plaintiff-employee who alleges retaliation must first establish that his speech is protected by the First Amendment. Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). To determine whether speech is protected,

courts ask: (1) whether the employee spoke as a citizen (2) on a matter of public concern." Suosa v. Roque, 578 F.3d 164, 170 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" Id. (quoting Garcetti, 547 U.S. at 418).

Thus, to sustain a First Amendment retaliation claim, a public employee, such as Delano, must show that: (1) he engaged in constitutionally protected speech; (2) his employer retaliated against him by performing an "adverse employment action"; and (3) the speech was a motivating factor in the adverse employment decision. Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (internal quotation marks and citation omitted).

Despite the importance of First Amendment protections, courts have also long "acknowledged the government's countervailing interest in controlling the operation of its workplaces." Lane, 134 S. Ct. at 2377. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418. Thus, even if the three conditions outlined above are met, the government entity can still prevail if it "had an adequate justification for treating the employee differently from any other member of the general public." Id. To establish whether the government entity was justified in taking an adverse employment action against the employee – was justified, that is, in treating the employee differently from any other member of the general public – a court must weigh "free speech

concerns . . . against efficient public service to ascertain to which the scale tips." Melzer v. Bd. of Ed. of City Sch. Dist. of the City of N.Y., 336 F.3d 185, 193 (2d Cir. 2003).

****

Addressing first the second step of the two-step inquiry, this Court finds that there can be no legitimate debate that Delano was speaking on a manner of public concern. Speech relates to a public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Indeed, "[i]t is hornbook law . . . that speech about the manner in which government is operated or should be operated is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment." Id. at 156 (Brennan, J., dissenting). Delano publically questioned the results of a high-profile murder investigation of a young girl, suggesting not only that the Police Department and the District Attorney's office were mistaken, or even unscrupulous, but that Girard's real killer remained at large.  This is plainly a matter of public concern.

Although it is a closer question, this Court also finds that Delano was speaking as a citizen during the WGRZ interview. Gibson argues that Delano's speech is not protected because his statements resulted from the special knowledge that he gained through his work as a detective. Thus, argues Gibson, Delano was speaking as a police officer, not a citizen. But "it bears emphasis" that "speech by public employees on subject matter related to their employment *holds special value precisely because those employees gain knowledge of matters of public concern through their employment.*" Lane, 134 S. Ct at 2379 (emphasis added). "For 'government employees are often in

12

the best position to know what ails the agencies for which they work.'" Id. (quoting Waters v. Churchill, 511 U.S. 661, 674, 114 S. Ct. 1878, 128 L.Ed.2d 686 (1994)). Indeed, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech." Id.

What is more, Delano's speech was directed at the public at large, and not up the chain of command within the department. C.f. Garcetti, 547 U.S. at 424 (internal memorandum not protected); Davis v. Mckinney, 518 F.3d 304, 313 (5th Cir. 2008) ("When a public employee raises complaints or concerns up the chain of the command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). Further, Delano travelled to D.C. on his own time and at his own cost, after the official investigation of the crime had been closed by the district attorney. And his comments were clearly not within his job description. Just the opposite: he was told not to speak about the case without prior approval.

Accordingly, this Court finds that in commenting about the Girard case during an interview with WGRZ, Delano was speaking as a citizen on a matter of public concern.

### 2.    Disruption

Because there is no dispute that the 60-day suspension constituted an adverse action, and since there can be no legitimate debate that the suspension was motivated at least in part by Delano's comments, this Court will turn to the next question: whether Gibson had "an adequate justification for treating [Delano] differently from any other member of the public" based on the government's needs as an employer. Garcetti, 547 U.S. at 418. In this regard, Gibson "has the burden to show that the employee's activity

13

is disruptive to the internal operations of the governmental unit in question." <u>Melzer</u>, 336 F.3d at 197. The disruption must be significant enough so that it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . .  or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." <u>Rankin v. McPherson</u>, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899, 97 L. Ed. 2d 315 (1987). The balancing test is "a process that looks at all the circumstances in a given situation and determines which interest weighs more heavily." <u>Melzer</u>, 336 F.3d at 197.

As an initial matter, Gibson argues that the factual findings rendered by the IHO as part of the internal sanction process have preclusive effect in this action. Defendants rely principally on <u>Burkybile v. Board of Education of Hastings-On-Hudson Union Free School District</u>, where the Second Circuit gave preclusive effect to a school administrator's disciplinary hearing in a subsequent First Amendment action in federal court. 411 F.3d 306, 313 (2d Cir. 2005). Delano offers no real response to this argument; instead he contends that because this is a First Amendment claim, it is distinct from the internal hearing, and thus collateral estoppel does not apply. "Detective Delano's First Amendment rights were not part of the disciplinary hearing," argues Plaintiff, "and were therefore not properly litigated in a prior proceeding." (Pl.'s Br. at 9; Docket No. 46-20.) But this misses Gibson's point. Gibson argues that the IHO's *factual findings* cannot be re-litigated here. He has not argued that this *entire action* is barred.

In any event, this Court finds it unnecessary to decide whether, as a matter of law, the hearing has any preclusive effect in this action because there is no real dispute over any of the pertinent facts. Delano cannot take issue with the IHO's findings that he

violated direct orders and other Buffalo Police Department rules and regulations.  It is in fact clear that Delano was ordered not to speak to the media or investigate the Girard case. Yet he persisted to conduct "an independent investigation of the DeJac case (Crystallyn Girard homicide) outside his regularly assigned duties without the authority of a higher commanding officer and, in fact, in direct violation of all directives requiring him to act in a contrary manner." (City Defs.' Stmnt. of Facts, ¶ 57.) As the IHO further found, "by investigating the case, [Delano] clearly violated the direct order that prohibited him from continuing to work on the case since he was not a member of Sergeant Rinaldo's crew." (Id., ¶ 50.)

Delano argues instead that his conduct and speech was not disruptive because the Girard case was closed. Despite Gibson's contention that a homicide is never closed, it was all but certain that no one was going to be prosecuted for Girard's death – the district attorney himself declared as much. That does not mean, however, that Delano's actions were not disruptive on a larger scale. The Supreme Court has emphasized the unique "need for discipline, *esprit de corps*, and uniformity" in a police force. Kelley v. Johnson, 425 U.S. 238, 246, 96 S. Ct. 1440, 47 L.Ed.2d 708 (1976). "Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." Tindle v. Caudell, 56 F.3d 966, 971 (8th Cir. 1995). The IHO correctly found that Delano's disobedience of the orders amounted to "a text book example of insubordination." (Defs.' Stmnt. of Facts, ¶ 55.) Not only did Delano speak to the media

in contravention of direct orders, he supplied departmental photographs and videos to the media in violation of yet more regulations.

Delano quibbles with this latter charge, maintaining that the photographs are the property of Lynn Peters (from whom Delano got authorization); that neither the video nor the photographs were ever marked as evidence; and that they had been shown in the media previously. (See Ex. J of Delano Aff.) To credit this argument, however, would raise semantics over substance. Crime-scene photographs and videos of polygraph examinations, whether previously aired or marked as evidence, and regardless who possesses legal title, owe their existence to the police investigation. Indeed, there is no dispute that the Buffalo Police Department recorded the video and took the pictures. This court must agree with the IHO that "[t]he video of the Girard and DeJac crime scene and the video of a suspect taking a polygraph examination comfortably falls within the category of 'departmental photographs," the release of which without authorization both violated internal rules and would clearly have a disruptive effect on the *esprit de corps* of the police force. It was therefore "entirely reasonable for [the Police Department] to predict that such insubordination and likely acts of future insubordination would harm [the Police Department's] ability to maintain discipline and order in the department, morale within the department, and close-working relationships between [Delano], his fellow officers, and his supervisors." Nixon v. City of Houston, 511 F.3d 494, 499 (5th Cir. 2007).  This is especially true considering that, although the Girard investigation was closed, Donahue remained under investigation in other homicides. Gibson was therefore justified in concluding that the doubt Delano

expressed in his statements and his disclosure of crime-related evidence could create discord and jeopardize the ongoing investigations.

Recently the Second Circuit ruled in a summary order that an assistant district attorney's public statement expressing criticism of his office "was sufficiently disruptive to justify terminating his employment." <u>Sacha v. Sedita</u>, 543 F. App'x 115, 116 (2d Cir. 2013). It ruled: "Though the public's interest in the subject of [the plaintiff's] speech is significant, it is not significant enough to overcome the systemic disruption to the Erie County District Attorney's Office that First Amendment protection for speech such as [the plaintiff's] has the potential to cause." <u>Id.</u> Surely that finding is equally applicable to the analogous facts here.

The importance of Delano's statements and the strong public interest in them is not lost on this Court. Whenever anyone – in particular a young girl – is found unexpectedly dead, the deceased's family and the public have an interest and a right to see that justice is served. Delano was clearly pursuing that interest. Indeed, he is revered by many for the doggedness with which he carried out his job. But in the highly charged atmosphere surrounding Girard's death, the Police Department had its own duty to ensure that it maintained a "significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." <u>Garcetti</u>, 547 U.S. at 418. No matter the merits of his motivation, Delano violated direct orders and various departmental rules.  This had the potential to cause a disruption significant enough to impair "discipline by superiors" and "harmony among co-workers." <u>See</u> <u>Rankin</u>, 483 U.S. at 388. Gibson was reasonable in concluding that the disruption had or could have "had a detrimental impact on close working

17

relationships," "imped[ed] the performance" of Delano's duties, or "interfere[d] with the regular operation of the enterprise." See id. The free-speech concern inherent in Delano's comments is strong, but Gibson's interest in maintaining control was undoubtedly stronger. His motion for summary judgment must therefore be granted.

### 3. Mt. Healthy

Gibson's motion must also be granted for an alternative reason. As in other areas of the law, the Supreme Court "has found it necessary to formulate a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). In the First Amendment context, courts must ask whether the employer has shown by a preponderance of the evidence that it would have taken the same adverse action even in the absence of the protected conduct. Id.

Here, a reasonable jury could only find that Delano would still have been suspended even if he had not spoken to WGRZ. As alluded to above, Gibson and the Police Department were focused not only on the nature of Delano's words; they found his actions to be at least equally intolerable. Gibson appropriately found that Delano violated critical orders and regulations by conducting an independent investigation and disclosing crucial evidence in the Girard case. Gibson has thus shown that "even if there [were] evidence that the adverse employment action was motivated in part by protected speech, . . . [he] would have taken the same adverse action in the absence of the protected speech." See Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998) (affirming dismissal of a First Amendment claim because the police officer's "insubordinate behavior" would have resulted in adverse action regardless of any protected speech).

Accordingly, for this alternative reason, Gibson's motion for summary judgment on Delano's First Amendment claim must be granted.

**D.     Breach of Contract**

Delano next argues that a collective-bargaining agreement (CBA) between his union and the Police Department imposed a duty on Defendants to act in good faith. This duty was breached, argues Delano without citation to authority or any further elaboration, when Defendants imposed the suspension and did not promote him.

There are several shortcomings with this argument.

First, Delano does not attempt to argue how Defendants breached the contract. He rests on the simple assertion that his suspension and the failure to promote him was somehow done in "bad faith."

Second, because the alleged breach of the implied covenant of good faith and fair dealing would arise from the CBA, the claim must be brought under § 301 of the Labor Management Relations Act. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985); Civardi v. Gen. Dynamics Corp., 603 F. Supp. 2d 393, 398 (D. Conn. 2009). But Delano does not mention this Act in his complaint or his memoranda. Further, "[i]ndividual employees [that are not signatories] cannot be made defendant parties to a cause of action for breach of contract under LMRA § 301." Spielmann v. Anchor Motor Freight, Inc., 551 F. Supp. 817, 820 n. 2 (S.D.N.Y. 1982). Delano does not allege or otherwise argue that any of the individual defendants were signatories to the CBA.

Finally, as Defendants point out, even if the CBA were breached, the remedy, as provided for in the agreement itself, is not first a suit in federal court but instead an

19

appeal to the Civil Service Commission or an Article 78 proceeding under New York law. And Delano "must first exhaust h[is] grievance and arbitration procedures established by the CBA before suing for breach of contract." <u>Gorenflo v. Penske Logistics</u>, 592 F. Supp. 2d 300, 306 (N.D.N.Y. 2009) (citing <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650, 652, 85 S. Ct. 614, 13 L.Ed.2d 580 (1965)). Without reference to this requirement, Delano concedes that he did not appeal to the commission or file an Article 78 action, but he argues that this action should stand as a substitute for an Article 78 proceeding. But even putting aside exhaustion requirements, federal courts typically should not exercise supplemental jurisdiction over an Article 78 claim. <u>See Carver v. Nassau Cnty. Interim Fin. Auth</u>, 730 F.3d 150, 155 (2d Cir. 2013) ("Whether or not Article 78 can itself deprive the district court of jurisdiction over claims brought under its provisions, the state preference to try Article 78 claims in state court . . . strongly support[s] declining that jurisdiction."). Further, even if this action could be considered an Article 78 proceeding, the four-month statute of limitations expired long before Delano filed the complaint. <u>See</u> N.Y. C.P.L.R. § 217. Accordingly, Defendants' motion on this poorly developed claim is granted.

### IV. CONCLUSION

"[A] citizen who works for the government is nonetheless still a citizen." <u>Garcetti</u>, 547 U.S. at 419. Thus, "the First Amendment limits a public employer's ability to leverage the employment relationship to restrict . . . the liberties employees enjoy in their capacities as private citizens." <u>Id.</u> Yet, because the Police Department is charged with providing the essential service of public safety, "the Constitution provides a State with greater leeway to control employees' speech that threatens to undermine its ability

to perform its legitimate functions." <u>Lewis v. Cowen</u>, 165 F.3d 154, 161 (2d Cir. 1999). Gibson justifiably found that Delano's comments and his disclosure of information and evidence concerning Girard's death had the potential to disturb that function. This concern outweighs Delano's free-speech right. Gibson's motion for summary judgment on Delano's First Amendment claim is therefore granted.

Further, for the reasons discussed above, the remainder of Delano's claims must also be dismissed.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motions for Summary Judgment (Docket Nos. 44, 45) are GRANTED.

FURTHER, that the Clerk of Court shall close this case.

Dated: August 29, 2014
       Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
